On behalf of Mr. Stolberg, Mr. Kevin Rosner, and William Hendrick, on behalf of the people, Mary Beth Burns. Thank you. Mr. Rosner, you may proceed. May it please the Court that with Your Honor's permission, my colleague and trial partner William Hendrick would like to give a five-minute rebuttal. Sure. Thank you, Your Honor. Your Honor, there's essentially three main issues on appeal in this case where the defendant was convicted for involuntary manslaughter. The first issue is causation, whether the defendant actually caused the death of his wife, Rachel. The second main issue is whether the trial court erred in admitting the defendant's And the third main issue is whether the defendant's sentence in this case was appropriate. As to the first issue, as the defendant's position, the State failed to prove beyond a reasonable doubt that the defendant actually caused the death of his wife. There was only one witness that testified for the State in this case, Dr. Manuel Montes. He is not board certified in forensic pathology. In fact, he failed his anatomical boards. He opined that the decedent died of traumatic asphyxia during physical restraint. At the same time, he acknowledged that the coroner found that there was no evidence of trauma-related injuries, that there was no evidence of strangulation or constriction of the decedent's airways. No significant injuries to the decedent's neck, face, skull, and torso. The doctor didn't know how much pressure or how long was applied in the defendant laying on top of his wife. None of the injuries that were sustained... Well, he did identify, I thought, one of two possibilities. It was either the heel of the palm of the hand, specifically near the tailbone and on Right. But he didn't say that that action in and of itself caused her death and that that specific injury by the knee being placed at the base of her spine was significant enough to cause her death. We don't look just at his testimony, though, in reviewing the case, correct? We look at all of the evidence, including your client's statements... Correct. ...where he said that he laid on top of her until she stopped breathing or was calmed down, correct? That is correct. That was the testimony. But, you know, our defense expert that came in and testified, Dr. Chakoutis, she had to analyze the body itself, and she didn't find the telltale signs of asphyxia. For instance, no petechia of the eyes, face, mouth, or larynx. She specifically refuted any evidence of cyanosis related to traumatic asphyxiation. She didn't find any rib fractures, extensive hemorrhage or bruising of the chest or back that would all be consistent with traumatic asphyxiation. Why isn't this competing evidence in the province of the jury, though? I mean, we have one doc saying one thing, another doc saying something else. Why are we going to overrule the jury verdict that way? Well, because, Your Honor, as you're familiar, of course, with the standard here, it is in the light and favorable to the prosecution. But we believe that no rational trier of fact, after hearing this evidence, could have found beyond a reasonable doubt that the defendant caused his wife's death. So it's a matter of weighing the evidence, and we believe that the jury in this case weighed it in properly. So no one could believe Montes? Based on your reading of this record, nobody could believe Montes? No rational trier of fact could believe Montes? We believe that it was the state's burden and that the testimony that he presented as to his theory of traumatic asphyxiation, he didn't have enough scientific evidence to support it. And I think the testimony at the end of the day was that the defendant laid on top of his wife for a period of, I believe, less than a minute. So we didn't believe that that was consistent. So, Your Honor, if there's no corroborating theory of death, then there's no corpus delicta and no criminal agency. Now, this lack of evidence, we felt, was magnified by the prosecution's theory that the defendant was somehow negligent because he was opposed to psychotropic medication and he was opposed to hospitalization. Because clearly, in this case, we had a decedent who was under some type of psychological distress. Her sisters testified to that fact, but there was never any testimony that showed that the decedent herself actually shared in these beliefs. And then there were two IPI instructions, 3.01, which said that the offense did not need to occur on June 7, 2013, and IPI 7.15, which told the jury that the defendant need only be a contributory cause to Rachel's death. We believe that these IPI instructions gave the jury a further opportunity to prejudice their decision, prejudice the defendant, and that somehow he may have been convicted in this case of his beliefs. So we believe that there was not sufficient evidence to support causation. Now, this leads into what happened with the decedent's body in this case. And we addressed this in a prior motion. Causation was a major issue in this case. But what happened? I mean, this wasn't a clear homicide where there was no issue about how she died. The coroner was present at the residence right after. The family and the defendant the whole time were asking about an autopsy. We believe that how the body was handled in this case also served to prejudice the defendant. We believe there was a due process violation under Fisher that the State's destruction of evidence in this case showed bad faith, that this wasn't merely a potential useful evidence like in young blood. The body was turned over to the coroner two days after the defendant appearing in court at a bond hearing. He made a motion under 412 for Brady evidence. And then three days later, the body was cremated. Well, what's the specific bad faith? The bad faith is the timeline here, Your Honor. We had the five days total that the body, from the time the defendant was released to the time it was cremated, where causation was at issue. I find that to be, you know, this wasn't a straightforward case. So what happened? We were never given the opportunity. We couldn't, because the body was cremated, we couldn't conduct our own forensic autopsy. Well, if your doctor testified that she didn't need the body to run her opinions, what's the worst prejudice? We believe that her examination would have been more thorough, Your Honor. That's not her testimony. What about her testimony? Her testimony was that she was more thorough than Dr. Montes in that she conducted histology testing. But I'm not aware of her. Well, how could she do histology testing? There's some issue as did he take the tissue and do slides. At first she said he didn't. Or what she said is I could tell from histology slides. And then in her summary of her opinion, she said she looked at histology slides. So did she or did she not? She did, but Dr. Montes did not. Well, he took the slides. Right, but he didn't do any testing. So her testing was more thorough. She was more qualified. She's board certified in forensic autopsy. She's older. She's been out there longer. She probably does have more experience. Dr. Montes says that, you know, he gets called periodically. He's done residencies. He's done these things. But her concern was that it was some sort of heart issue because of a history of rheumatic something fever, scar fever or something of that nature, and then just her current condition. But she didn't confirm that with any of the testing that had been done either by her or by the coroner's office, did she? She did. After her testing, she opined that she believed that the decedent died of natural causes, either through sudden cardiac death, hyperglycemia with ketoacidosis or an electrolyte imbalance. She said that Rachel suffered from a schizoaffective disorder and that this was commonly or could commonly be associated with a sudden and premature death. She said that lab records and sample tissues evidence heart disease, a history of heart murmur, diabetes and electrolyte imbalance. But she didn't say that those, that evidence that she reviewed or tested proved those things. It just said it was consistent with, correct? Correct. Okay. Now, so the issue of causation, we have this very short turnaround. The body is cremated. And maybe if she had a full examination, there would have been causation proof. You're arguing the same problem that I think is created by the evidence. You cannot, as I read Fisher, it's not maybe would be helpful. It's material exculpatory. Well, we believe under these facts and circumstances, under the short timeline we had here, five days, that it probably would have been exculpable.  Your theory is that this cause of death is so rare that law enforcement should have known to preserve the body at least until the defendant's on notice that there's going to be a cremation, correct? Yes, Your Honor. And your bad faith argument, you're not suggesting that the state's attorney knew about the cremation. You're saying that the police officers knew. The police officer and the deputy coroner, who was actually present at the household, knew all the circumstances behind the death. And bad faith is not just what the prosecutor decides. Bad faith extends to what law enforcement or the state decides. Correct. Our second point is the ruling on the motion to suppress evidence. We believe in this case the defendant clearly and unequivocally invoked his right. He invoked it nine times in nine different ways. Both officers testified that despite him invoking his right, they continued questioning him. He was never given an opportunity to consult with an attorney. After he made his request, he was punished, he was handcuffed, he was told that he was in custody, and then he was taken out of the cell and driven back to the Vernon Hills Police Department where he came from. Did they offer any of those statements of evidence that he made? You said he invoked his right to an attorney. Yes. And then they continued questioning him. Yes. And then during that time frame, did they offer any of those statements of evidence? All of those statements came into evidence at the trial. Yeah. All of them. Anything that he said. On his way back to Vernon Hills, let's talk about another timeline. On his way back to Vernon Hills, he said, how come nobody's talking to me? You invoked your right to an attorney. Right. I'm not, we can't talk to you. And the statements come after that when he says, okay, I'll talk to you, but I want to talk to my mother first. Is his mother an attorney? I don't think that's in the record. No, but what's interesting is that that was the same condition that he had placed before, even when he. . . Well, but he mentioned lawyer the first time. The second time, I didn't find anything that said lawyer. Well, I don't think his comment in the car, why isn't anybody talking to me, is a willingness to discuss the investigation. Well, not, no, I agree. That's not the part. Right. Well, what if I do cooperate? Okay, I want to talk to my mother and then I'll talk to you. Okay. Where did the, I mean, if mom's not a lawyer, and I respect that mothers are very special in these situations. If mom isn't a lawyer, where does it say he can talk to mom and then cooperate? Or where does that, where do we have a case that says the request to talk to his mother is tantamount to a request to talk to a lawyer? Right. You know, I acknowledge, Your Honor, there's no constitutional right to talk to your mother, but it was the way that she was used in this case. After he had been Mirandized, you know, two hours before, he then is taken back under the same condition and says, all right, I'm going to talk to you, but I want to talk to my mother first. His mother, of course, the police in this case, they never brought Ms. Stolberg to him. They made a bunch of, a series of empty promises that she's on her way, we're going to go and pick her up, and this went on and on and on. Because they know that if his mother was brought to him, that that would probably have thwarted their investigation. What does that have to do with his constitutional rights in this case? Well, because he invoked, you know, he said, I want to talk to an attorney. And then within a very short period of time, he's re-Mirandized. I don't know what the purpose of the second Miranda waiver was. Well, because he has to be re-Mirandized. That's one of the factors if somebody re-initiates conversations with law enforcement. If they didn't re-Mirandize him, you'd have a real nice argument. So you're saying re-Mirandizing was a problem? Well, but after Mirandizing, give the gentleman an opportunity to talk to a lawyer. He didn't do that. He re-initiated though. I mean, they don't have to. Where is the case that says in addition to re-Mirandizing after a suspect re-initiates, he must then be given access to an attorney? This occurred within an extremely short period of time. And the defendant, this is what's interesting. It is their burden under Edwards to show that the second waiver is knowing and intelligent. And this was his response. A very short time later, defendant, you say I have a right to a lawyer. But if I ask you, you won't talk to me. I think that still, even at this juncture, because it was such a short period of time, he didn't understand truly what having a right to talk to a lawyer even meant. So without giving him the opportunity to do that, it was a no-no. Sounds like he understood better than most lawyers do exactly what was going on. You say that if I ask for a lawyer, you will not talk to me. Well, that's true. He certainly understood what was happening. How does that show some lack of knowledge about what was going on? And then he says, then again, of course, he says the same condition. Okay, fine. Maybe I'll talk to you, but I want to talk to my mother. But then what happened next? So without his mother there, without a lawyer present, we get this five-hour interrogation where the questions by Officer Tishneri theorizing about the manner and cause of death, which obviously she's not trained, she's not an expert to do that, and the defendant's contribution to that. Do you dispute that while the police said they were going to get mother, that somebody sat with him and said, okay, so we're here. What do you want to do while we're waiting for your mom? And does he then make a statement the victim was sick? He initiates a conversation. Yes, I would confess that. We believe that the tape recordings and transcripts of that proceeding were substantially inaccurate, that there were at least a thousand inaudible passages, that the defendant was somewhat soft-spoken, but it was not his responsibility to set up the room, the recording and all that. And listening to that, there was a lot of testimony that you just simply couldn't hear. Finally, Your Honors, I know I'm a little bit over here. Do you have any other questions? No, I don't right now. All right. Counsel, your time is up, so we will move on to the state's argument, and you will have time for rebuttal later. Thank you, Mr. Hedrick. Ms. Burrage, you may proceed. Good morning, Your Honors. May it please the Court, my name is Mary Beth Burns, and I represent the people of the state of Illinois. We come before you this morning to ask this Court to affirm the defendant's conviction and sentence. I have to admit that any points that I'm going to raise, this Court has already discussed. And I think among the things that might be clarified, the defendant has consistently attacked the qualifications of Dr. Montez. And when Dr. Montez explained he was asked why he had or had he, in fact, not passed the certification exam, he said that he had not passed it and he believed it was because it was not based on actual working with slides. And so he said that he would take it again, but apparently. And the test that he took was not simply the forensic pathology for doing autopsies, but that it also included doing pathological work for hospitals in dealing with patient diagnostics. As far as his qualification- Has he been qualified in the past in court to render opinion testimony in the area of cause of death? Many times. He has testified as an expert in over 100 cases. And he has done autopsies in several hundreds of cases. In Illinois, about 100 a year. And in New York, I think about 200 a year. And certification isn't required in all of the places he worked, correct? It was not required in any of the places that he worked. It's not required, but it is preferred. Exactly. Okay. How would you characterize the cause of death? You characterize the cause of death as asphyxia based on restraint. Positional asphyxiation is another term that's used. And that is a very, would you agree, in homicide cases, it's pretty rare. It's very rare. And the way he explained it, it could cause, it could occur even without the breaking of the ribs, which in some respects almost sounds counterintuitive if you're having that much pressure. But he said that what's necessary is an amount of pressure that the lungs cannot expand. And that because the lungs cannot expand, you cannot oxygenate. And that under that circumstance, you could have been brain dead within two to three minutes. Right. And that particular cause of death is very common. When you see it, usually it's police officers making an arrest, paramedics restraining a person who's mentally ill, and then that person expires in a short period of time and isn't responding the way a normal, healthy adult would. To tell you the truth, Your Honor, I can't answer that question. I honestly don't know. You haven't heard of police officers? This was the first time that I'd seen that type of asphyxiation. Assuming all of the evidence in this case is what it is and the victim did die from this cause of death, how does that become a homicide when it was a procedure that he employed many, many times over the course of their marriage to calm her down, maybe not as forceful, but holding her? How is that not an accident? In this instance, both the jury and the trial court found that his conduct was reckless, and it rises to criminality as recklessness in that he had held her to calm her. He had sometimes placed her on the floor gently to calm her. Her mother knew that, or his mother knew that he had used this tactic, correct? I believe so. Did anybody else know that? I do not know. However, what may have been different here than in the other instances is that the autopsy report showed pressure on her back, which could have been either from the palm of the hand or from a knee, and that it was down enough to, again, keep her from being able to breathe for a minimum of two to three minutes, which clearly is not what happened before. And even as the night, the incidence of the evening progressed, it continued to escalate to where he would try and calm her and then try and calm her, and then it's apparent by the end that it was sort of beyond trying to calm her and simply getting her to leave him alone because he needed sleep, he needed to go to bed, he needed to go to work the next day. But that, again, the nature of the pressure so escalated. He doesn't say he's frustrated, though. When he's talking to the police, he doesn't say, for God's sakes, I had to get up in the morning. What was I supposed to do? Well, right. He doesn't say it. I am characterizing, I'm making a characterization based on all that he did say about that night because it is apparent that that night things continued to be more out of hand. He became more reactive to her neediness or whatever it was that was going on. You know, it's very hard to tell from reading about it whether it was a matter of her being needy or whether it was a matter of being passive aggressive and simply doing it to piss him off. I apologize. It is somewhat difficult to determine. But based on his own statements and based on the pathology report, it is apparent that the level of stress that was placed on her was enough to make her unable to expand her lungs such that she could breathe. And, again, the jurors were given the instruction that the defense asked for, and they found, I think correctly on the facts, that he was guilty of involuntary manslaughter. In discussing sentencing, the trial court very specifically said that he respected the jury's verdict but that the level of recklessness was really extraordinary in his handling of his wife. So I think that neither the judge nor the jury found that his behavior constituted an accident. Let's go to another question. Do you agree that if there was bad faith that the mindset of law enforcement and the coroner acting together to have the body cremated without notice to the defense, that if there is bad faith that it's attributable to the prosecutor? Yes. However, I think you would need a significant level of evidence to show this. This was litigated in the motion to dismiss, and it was the defendant's burden at the motion to dismiss to make the showing that he needed. And clearly there is no evidence of bad faith whatsoever. Let's look at statutory authority. There should be an inquest, correct? I mean, if there is a question concerning the matter of death, usually an inquest, and there's a section that says after the body is kept until after the inquest? I don't know that that section that discusses a body being kept until after the inquest can be read to require an inquest. And I'll be honest, I've been doing this for 25 years. I don't know that I've ever read a murder that had an inquest. You know, it's something that obviously is available if someone seeks it, but it's not something that shows up in records frequently at all. Again, I've never seen one, and I've never heard people in my office discuss them. I can tell you they're commonplace. Inquests in murder cases are fairly common. In reckless homicides, perhaps not. But in murder cases, they're not uncommon. In counties where there's a coroner, they have to have an inquest. If there's a medical examiner, then they're not. I'm sorry? In counties where there's a coroner, they are supposed to have inquests on cause of death where that manner and cause of death is at issue, whereas where there's a medical examiner situation like in Cook County, you don't have to have an inquest. Okay. Lake County, I believe, is a coroner situation based upon Dr. Montes' own testimony. Right. He determined cause, the coroner determined manner, and manner is determined by inquest, if you read definition. So we didn't have an inquest here. We have five days that have gone by since the allegations have been made, the charges have been made. This assistant coroner who is making this decision is at the house, according to counsel, and I think the record would indicate that. He has seen, at a minimum, probably the defendant's mother there, and we have testimony from two sisters. Why? Nobody is contacted, and the body is just sent to a funeral home. The record does not indicate that no one was contacted. The record indicates that neither the defendant nor his mother were contacted. The record is silent as to whether the victim's family was contacted. Well, all right, so maybe they were contacted, but then he said that he talked to a police officer to make the decision that the body was no longer needed. So we have to sort of make the implication that he didn't talk to anybody who might want the body, and if she's got a couple sisters, why wouldn't they want to bury her? That's another issue, but why does he talk to a police officer about whether the body is needed when there is a murder investigation pending? I cannot answer that question. The record doesn't answer the question. I would assume that they would talk to the state's attorney's office and to the family. Again, I don't know if the victim's family was addressed. I don't know if they asked that it was cremated per the family's request. The record simply doesn't show that. Let me ask you this. I don't know if you're familiar with this. Do you know whether or not Lake County has enacted or has adopted a homicide and questionable death protocol that's designed... I'm sorry, I do not know. ...required by law and designed to provide for the types of communication that Justice Hutchinson is asking about? Do you know whether they have a protocol? I do not know. If it's required by law, I would assume that they do, but the record doesn't indicate it. Again, I guess my concern when I was reading this, and this was perhaps naive, was that the entire discussion at the hearing and the motion to dismiss was that neither the defendant nor his mother were contacted. And my concern, my thought, in the way this was litigated is that the sisters were and that that would not have incurred. But again, that's me reading something in that also is not a record. But it seemed bizarre to me that a body would be destroyed without talking to next of kin, which at that point I would believe if your husband was under suspicion of your murder, your next of kin would be your sisters or if you had a mother or whatever. What about the discovery request that was made a few days earlier? The discovery request was a general basic discovery request asking for any information that would be exculpatory under Brady. Any evidence which tends to negate defendant's guilt. He was charged with murder immediately. I mean, it wasn't days later. It was within 24 probably hours. I believe so. He was in court right after the day after that, and shortly after that the discovery request was made. You have a murder investigation. Do you have to be a murder charge? It's not an investigation anymore. Do you have to say I want the body preserved? Yes, absolutely. There's no reason. Well, must you say it? Pardon me? Does I maybe it's better practice, but must you say it or does any evidence which tends to negate defendant's guilt sufficient? I think that requesting any evidence that tends to negate the defendant's guilt is insufficient to keep a body absent a specific request for the body. You're quite right if you don't know, if the state doesn't know or have knowledge of the potential exculpatory value of a piece of evidence. But if the state knows, and here you're having a state's attorney who was told this defendant's charged with murder. It was a coroner's report even written yet? Yes. It had been written? Yes. The autopsy report had been done. It was part of a larger coroner's report. I do not know. I know the autopsy report had been done. Had the discovery been tendered when the body was cremated? I do not know at what point. I believe discovery was tendered at every point that they were in court. I do not know what was tendered at the point that they made the initial discovery request. If your honors have no other questions, then again we ask this court to affirm. Thank you very much. Thank you, Ms. Burrs. Mr. Hendrick, you may proceed. May it please the court? William Hendrick, H-E-D-R-I-C-K, co-counsel on behalf of Mr. Stolberg. Briefly, with respect to the cause of death and the coroner's actions. Deputy Coroner Portillo testified. He was called as a defense witness at trial. He testified that he was at the scene of the occurrence. That when he observed the body in place at the occurrence, he looked for signs of trauma. He saw no signs of trauma on the body whatsoever, front or back. We know from photographs taken by E.T.s at the scene, obviously present at the scene, but not commented upon by Deputy Coroner Portillo, were paper bags filled with all these herbal supplements and bottles lining all the flat surfaces in the kitchen. There were a relative later testified, relative to the defense, said there were something like 60 herbal supplements in bottle form. There were certainly, Deputy Coroner Portillo also said there were no signs of defensive, any kind of defensive injuries for her. There were no signs of a struggle.  It would be one thing if there were five bullet wounds and it was obvious and there were bullets lying in the kitchen or whatever. We don't have any of that. Was the body potentially exculpatory evidence? Yes, absolutely. In what fashion? In these fashions, first of all. With respect to the slides, the slides, if I remember correctly, Dr. Montez's testimony, he said he created a stockpot of tissue, and then when we retained Dr. Teese, Dr. Teese asked me to call the coroner's office to get slides, and I did so. And my belief is that's when slides were actually created. I don't think Dr. Montez actually had, he created this reservoir of tissue, but I don't think he ever created slides for it or examined it in any fashion. You're calling into question Montez's opinion. We're talking about the destruction of the body, and my question is specifically, what is in the record to show that this body was potentially exculpatory evidence? The tissues. But you have the tissue. Yes, but all we had were the tissue samples. Everything else Dr. Teese was working with were from photographs, plus the medical records of the Lexington Brothers Psychiatric Center of 30 days, 30 days prior to these events. Did she need more? Well, she was working with what she had. She did not tell me she needed more. I don't think she testified she needed more. I think Justice Burkett pointed out she had enough to render an opinion, and her opinion was this was a natural cause. There was no criminal or homicidal cause to this event at all. And I think at one point she said to the jury, you know, if this had been my autopsy, nobody would be here in the courtroom. It just would never have been a homicide. It would never have been an indicted case. She does say that, and probably they could imply that that's what she meant. But the question that I'm concerned about is, although she said she had not known that the body had been cremated when it had been, she did testify it made no difference to me. So in anywhere did she ever say that she needed something else specifically related to the heart that would have helped her, you know, nail this down as a cause of death? Well, part of the problem with the case is there are a series of errors that all fed on each other, built and magnified each other around the cause of death issue, for example. It's magnified here by the prosecution's insistence of drawing out testimony and arguing to the jury that Dr. Montes was the superior pathologist in this case because he actually had hands on with the body. We had objected to that. We had made a motion to bar because of the destruction of the body. We moved to bar that, and we were denied it. Go ahead and finish your point. And so that added to it. The jury instructions added to it because I think they really lessened, had the effect of lessening the burden of proof here as the cause of death. The indictment charged murder by asphyxiation by force, but that's the only place. The arguments made to the jury were the defendant had opinions against psychotropic medication. He was against her being admitted to a psychiatric hospital 30 days before these events. He was not trying to keep her in the psychiatric hospital. And they argued these things. They put a relative on from the other side of the family, from the deceased family, to testify well if the defendant had a terrible opinion about psychotropic medications. He was always opposed to hospice. He was always opposed to these medications. That's what she really needed. And we give the jury a cause, a jury instruction which says the defendant's conduct or the defendant merely needs to be a contributing cause of death. So what happens if our jury decides the defendant's attitude on May 30th when he was opposed to her being admitted to a psychiatric hospital is a cause of death? The jury was also told, given an instruction saying June 7th, the date she dies, it doesn't have to be that date. That does not have to be the date of the fatality or the causation. So that could take us all the way back to May 30th. And again, the defendant's opinions or beliefs regarding medication could be a contributing cause of the death of this case. Let me ask you, what's the timetable? The body's cremated 5 days after the death, correct? Right. And when did the defendant make his request for access to the body for an autopsy? I did not. Mr. Rosner came and filed a motion for discovery, I think on the third or fourth day, somewhere in there. The deputy coroner Portillo, A, as I said, knew about this was not an obvious cause of death. I'm asking for the time frame. I'm sorry. When was the request made? It was not. Okay. And when did you learn that the body had been cremated? Much later. I think post when we get discovery, post the indictment. And we did not see a coroner's report for a couple of months. So is the coroner supposed to hold the body indefinitely until there's a request for an independent autopsy or review of the body by the defendant? Deputy Coroner Portillo admitted in his testimony that he made no effort whatsoever to reach out to the defendant, the defendant's mother, or the defendant's counsel of record. Certainly, Mr. Rosner was then on record as being counsel for the defendant. He had an address. He had a phone number. He had a name. And Deputy Coroner Portillo made no effort to contact him or apprise him that the body was going for cremation. It was not just going to a funeral home. The documents themselves, they knew it was for the purpose of cremation. May I address just one other thing about sentencing? Or I've gone way past time. Okay. Counsel, thank you very much for your testimony. Thank you very much. Appreciate it. We do appreciate all the attorneys out here today. The case will be taken under advisement. We are reassured.